HALL, Judge.
The issues presented in these expropriation suits before this court on writs of cer-tiorari relate to the authority of the Monroe Redevelopment Agency under Act 215 of 1968 to expropriate private property for flood control purposes pursuant to a redevelopment plan and to the validity of an election in which the electorate of the City of Monroe approved a redevelopment plan for that City.
Monroe Redevelopment Agency filed separate suits against the three defendants, Gilbert Faulk, John Howard Carroll and T. D. L. Corporation, seeking to expropriate property owned by the defendants situated in the City of Monroe. The petitions allege that plaintiff is a political corporation of the State of Louisiana created by the Commission Council of the City of Monroe pursuant to Act 215 of 1968 of the Louisiana Legislature. It is alleged that the Agency must acquire the property owned by the defendants for the purpose of the “Monroe Floodwall Gap Project”. It is further alleged that the acquisition of the subject property by the Agency and the use thereof for construction and maintenance of the Monroe Floodwall Gap Project will be conducive to the public interest, health and welfare and is desirable and necessary. Plaintiff alleges it is authorized to exercise the power of expropriation for the purpose of acquiring the subject property for use as the" Monroe Flood-wall Gap under the provisions of Act 215 of 1968; LSA-R.S. 33:4621 et seq.; and LSA-R.S. 19:2 et seq.
Defendants filed peremptory exceptions of no right and no cause of action and motions for summary judgment seeking dismissal of the expropriation suits on the following grounds:
(1) Act 215 of 1968 does not vest plaintiff with power or authority to expropriate private property for flood control purposes.
(2) The special election held" for the purpose of securing community approval of plaintiff’s redevelopment plan as required by Act 215, at which election a majority of the votes was in favor of the plan, is illegal, null and void because the proposition submitted to the people did not comply with the provisions of Section 7(c) of the Act and constituted “logrolling” in that the proposition allowed for only one vote on multiple, unrelated projects and issues.
(3)Defendants were not provided proper notice as an essential prerequisite to the acquisition of their property as required by federal law.
After a hearing at which various exhibits and documents were filed into the record, the exceptions and the motions for summary judgment were overruled by the district court, which rendered written reasons for judgment. Each defendant applied to this court for writs of certiorari which were granted.
After hearing oral argument and considering the authoritative and exhaustive briefs of counsel, we conclude the district court correctly resolved each issue in overruling the exceptions and motions. Accordingly, the writs granted will be vacated and recalled and the cases remanded to the district court for further proceedings.
AUTHORITY TO EXPROPRIATE
Defendants’ first contention is that the statute authorizing the creation of the Monroe Redevelopment Agency and defining its power and authority does not vest in the Agency the power or authority to expropriate private property for flood protection or control purposes. They cite good authority for the proposition that expropriation is a harsh remedy and expropriation statutes must be strictly construed. See Texas Gas Transmission Corporation v. Soileau, 251 So.2d 104 (La.App. 3d Cir. 1971).
The scope and purpose of Act 215 of 1968, referred to as the “Monroe, Louisi *581 ana Redevelopment Agency Act”, is expressed in the title to the Act as follows:
“To allow, by local option, the formulation of a program by the governing body of Monroe, Louisiana, for the utilization of appropriate private and public resources to eliminate and prevent the development or spread of slums; to allow the creation and organization of a Redevelopment Agency; to allow the rehabilitation, clearance, and redevelopment of slums and blighted areas in Monroe, Louisiana, in accordance with redevelopment plans or projects approved by the governing body of the City of Monroe, Louisiana, to define the duties, liabilities, authority and functions of such redevelopment agency, including the acquisition of property by negotiation, gift or expropriation; to dispose of property by sale or lease; to issue bonds, borrow money and give security therefor; to provide for notice and hearing; to enter into agreements to secure Federal aid; to authorize public bodies to furnish funds, services, facilities and property in aid of redevelopment projects.”
The statute was enacted in order to enable the City of Monroe to take advantage of and utilize federal funds and programs available under federal legislation for the elimination of slum and blighted areas and the redevelopment of such areas.
The express authority of the Agency to expropriate private property is contained in Section 8(a) of the Act as follows:
“(a) Subject to the requirements of Section 7 hereof, the agency may acquire by purchase • or by the exercise of the power of expropriation any real property, or interest therein, which it may deem necessary for or in connection with a redevelopment plan or project under this Act. The agency may exercise the power of expropriation in the manner provided in the Civil Code relative to the transfer of property, and the laws supplementary or amendatory thereto, or it may exercise the power of expropriation in the manner now or which may be hereafter provided by any other statutory provision for the exercise of the power of expropriation. Property already devoted to a public use may be purchased in a like manner, but no real property belonging to the United States, the state, or any political subdivision of the state, may be acquired without its consent.”
Section 6 of the Act provides in pertinent part:
“The agency shall have all the authority and power necessary or convenient to carry out and effectuate the purposes and provisions of this Act, including without limiting the generality of the foregoing, the following authority which shall be in addition to others herein granted:
“ * * *
“(c) Within its area of operation, to acquire by purchase, lease, option, gift, grant, bequest, devise, expropriation or otherwise, any real property (or personal property for its administrative purposes) together with any improvements thereon ;
The pleadings and exhibits in the record establish that the floodwall project is part of a redevelopment plan for the City entitled “Monroe Neighborhood Redevelopment Program for Downtown-Washington Community and Bryant’s Addition Area”, adopted by the Agency, approved by the governing body of the City, and approved by the electorate, all in accordance with the Act. The record reflects that defendants’ property lies within the redevelopment area encompassed in the redevelopment plan.
As a matter of legislative determination, Section 2(f) of the Act declares:
“(f) The powers conferred by this Act are for public uses, purposes and utility for which public money may be *582 expended, and expropriation authority-utilized as necessary and in the public’s interest and in conformity with the approved plans of the municipality.
The scheme of the Act is the clearance and comprehensive improvement and redevelopment of areas determined to be slum and blighted areas. Under the Act, redevelopment undertakings and activities can take many forms. The Act authorizes the Agency to acquire private property within a redevelopment area and to sell, lease or otherwise dispose of such property for residential, recreational, commercial, industrial or other uses or for public use in accordance with the redevelopment plan subject to such conditions and restrictions as the Agency may deem necessary or desirable in preventing the development or spread of slums or blighted areas or to otherwise carry out the purposes of the Act. Section 9(a). The Agency is authorized to provide or to arrange or contract for the furnishing or repair of services, privileges, works, streets, roads, public utilities or other facilities for or in connection with a redevelopment project and to install, construct and reconstruct streets, utilities, parks, playgrounds and other public improvements. Section 6(b). The Agency is further authorized to close or cause to be closed, vacate, plan or replan streets, roads, sidewalks, ways or other places, and to plan or caused to be replanned any part of the municipality. Section 6(j). For the purpose of aiding in the planning, undertaking and carrying out of a redevelopment plan, any public body is authorized to cause public buildings and public facilities including parks, playgrounds, recreational, community, educational, water, sewer or drainage facilities, or any other works which it is otherwise empowered to undertake to be furnished. Section 13(a)(6).-
The Act provides that the undertakings and activities in accordance with a redevelopment plan may include installation, construction or reconstruction of streets, utilities, parks, playgrounds and other improvements necessary for carrying out in the redevelopment area the redevelopment objectives of this Act in accordance with the redevelopment plan. Section 17(j)(3). Such activities may also include purchase of real property in the redevelopment area where necessary to eliminate unhealthful, unsanitary or unsafe conditions or to provide land for needed public facilities. Section 17(j)(7).
While the Act does not specifically mention flood control or flood protection, the Act does specifically provide for the acquisition of property for public improvements and public facilities. The Act does not and could not specifically enumerate every sort of needed public improvement and facility. Inadequate flood protection and control could certainly contribute to the creation and continuation of a slum or blighted area. Likewise, adequate flood protection is certainly essential to the proper redevelopment of an area of a city — just as essential as adequate streets, drainage and the like.
We hold that flood protection and control is within the scope of the undertakings and activities authorized by the Act under a redevelopment plan and that the Redevelopment Agency has the power and authority to acquire property by expropriation for such purpose pursuant to a redevelopment plan.
VALIDITY OF THE ELECTION
Section 7(c) of Act 215 provides:
“(c) Community Approval of Redevelopment Plans and Projects. Each redevelopment plan or project proposed or caused to be proposed by the agency in compliance with this act shall be approved by the qualified electorate of the municipality voting at an election called for the purpose of approving the plan or project; . . . ”
The redevelopment plan previously referred to was submitted to the qualified *583 electorate of the City of Monroe at an election held October 28, 1969, and was approved by a majority of the votes cast. The proposition submitted to the voters read as follows:
“Shall the Commission Council of the City of Monroe, Louisiana, acting as the Redevelopment Agency of said City, undertake the redevelopment plan or project approved by it at a meeting held on September 23, 1969, which plan or project is entitled ‘Monroe Neighborhood Redevelopment Program for Downtown-Washington Community and Bryant’s Addition Area’, which plan or project provides for elimination of substandard housing by relocation of occupants of such housing and acquisition and demolition thereof and resale of cleared sites for new housing or by promotion or rehabilitation of such housing and providing all possible assistance to the owners of such property, elimination of all substandard nonresidential structures by acquisition and demolition of such structures and resale of cleared sites for new uses or by promotion of rehabilitation of such substandard structures and provision of all possible assistance to the owners thereof, acquisition of property and construction of streets, sidewalks, parks, pedestrian overpasses, drainage .facilities, cemeteries, flood protection facilities, a public marina, recreational facilities and playgrounds and other public improvements and acquisition of land for expansion of schools and recreation centers throughout the redevelopment area, copy of which plan or project is on file in the office of the Secretary-Treasurer of the City of Monroe ; and in connection with such plan or project to apply for and receive advances from the Federal government or other bodies for the carrying out of such plan or project, all as authorized by the Constitution and laws of Louisiana, and, in particular, by the provisions of Louisiana Act 215 of 1968?”
Defendants contend the election was illegal, null and void in that it did not comply with Section 7(c) of the Act. Defendants urge that the proposition submitted to the voters included multiple areas, plans and/or projects and, therefore, did not meet the requirement of the Act which they interpret as requiring a separate vote or election on each plan and each project proposed by the Agency.
Defendants further contend that the submission to the voters of one proposition containing multiple, unrelated issues and projects amounted to “logrolling” which deprived the voters of a fair opportunity to cast yes or no votes on each of the separate projects or issues included in the proposition. In support of this contention, defendants point out that in a previous election, when a redevelopment plan or project limited solely to the floodwall gap undertaking was submitted to the electorate, that particular proposition was defeated by a majority of the voters.
Defendants’ contentions in regard to the validity of the election must be viewed in the light of the overall nature, scope and purpose of slum clearance and urban redevelopment legislation. Such legislation represents a modern-day approach to the solution of modern-day urban problems, combining the use of police power and private enterprise. It recognizes that deterioration and blight within cities cannot be cured or corrected on a piecemeal basis. Such legislation contemplates an area-wide approach with overall comprehensive planning for redevelopment of entire areas. Such legislation contemplates redevelopment of such areas in all the many-faceted aspects of community development including industrial, commercial, residential, recreational and public uses and facilities. This concept was recognized and approved by the United States Supreme Court in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), in which the court, considering the constitutionality of -the *584 District of Columbia Redevelopment Act of 1945, declared:
“ . . . It was important to redesign the whole area so as to eliminate the conditions that cause slums — the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas, the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures th'at were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes but also schools, churches, parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented . . .
Pursuant to Act 215 and after complying with all of the requirements of the Act, a comprehensive redevelopment plan entitled “Monroe Neighborhood Redevelopment Program for Downtown-Washington Community and Bryant’s Addition Area” was adopted by the Agency and approved by the City’s governing body. The area encompassed by the plan includes a substantial part of the City of Monroe (1,600 acres according to one exhibit in the record), all of which is contiguous except for a relatively small portion designated as Bryant’s Addition area. , The plan in substantial detail sets forth its legal basis and purpose, describes the redevelopment area, sets forth the development objectives, contains a general land use plan, describes redevelopment techniques to be used to achieve the plan objectives, describes redevelopment proposals, authorizes land disposition for redevelopment by private enterprise, and contains provisions for amending the plan.
Pursuant to Section 7(c) of Act 215, an election was called for the purpose of approving the redevelopment plan. The proposition submitted to the people, which is set forth in full above, describes in some detail the various undertakings provided for in the plan, such as elimination of substandard housing by acquisition and demolition thereof and resale of cleared sites or by rehabilitation of such housing; elimination of substandard non-residential structures by acquisition and demolition and resale of cleared sites for new uses or by rehabilitation; acquisition of property and construction of streets, sidewalks, parks, pedestrian overpasses, drainage facilities, cemeteries, flood protection facilities, a public marina, recreational facilities and playgrounds and other public improvements; and acquisition of land for expansion of schools and recreational centers.
Section 7(c) of Act 215 provides that “Each redevelopment plan or project” be approved by the qualified electorate at an .election called for the purpose of approving the plan or project.
 “Redevelopment Plan” is defined by the Act as meaning “a plan, as it exists from time to time for a redevelopment project”. Section 17(1). “Redevelopment Project” is defined as “undertakings and activities in a redevelopment area . in accordance with a redevelopment plan”. Section 17 (j). A redevelopment plan, then, is the scheme for redevelopment and a redevelopment project is the actual undertakings and activities to be conducted in accordance with the plan. As the words “plan or project” are disjunctively used in Section 7(c), the terms are virtually synonymous. The Act does not require that each separate undertaking and activity be separately presented to the electorate for approval. Such a procedure would be virtually impossible and entirely inconsistent with the purpose and intent of the Act as previously described. By its very nature a redevelopment plan contemplates numerous undertakings as essential parts of the overall comprehensive planning.
We hold that the plan and proposition as presented to the voters at the spe *585 cial election is in compliance with Section 7(c) of Act 215.
We further hold that the proposition as submitted did not constitute “logrolling” but, to the contrary, presented one general plan or scheme which, by its nature,’ included numerous related and consistent undertakings.
It is well-recognized that if there exists a natural relationship between the objectives to be voted on, they can be submitted in one proposition and, furthermore, if the proposals are part of one general plan or scheme not involving incongruous purposes, a blending of separate propositions does not arise. Holt v. Vernon Parish School Board, 217 La. 1, 45 So.2d 745 (1950); Humphreys v. City of Jennings, 185 La. 814, 171 So. 41 (1936); Henderson v. City of Shreveport, 137 La. 667, 69 So. 88 (1915); Dupre v. City of Houma, 216 So.2d 576 (La.App. 1st Cir. 1968), writ refused, 253 La. 329, 218 So.2d 45; 29 C.J.S. Elections § 170, at page 478.
In Holt, the Louisiana Supreme Court held:
“It appears that the test recognized by the jurisprudence of this state and other states is whether or not there exists a natural relationship between the structures or objects to be united in one proposition and a large discretion is vested in the courts in determining the relationship existing between the structures and objects. If there exists a natural relationship between the structures or objects it can be submitted in one proposition. * * * ”
All of the undertakings listed in the proposition were naturally and reasonably a part of one plan of urban redevelopment which, according to the weight of authority in this state and elsewhere, was properly presented to the voters in one proposition.
Defendants rely on Tolson v. Police Jury of St. Tammany Parish, 119 La. 215, 43 So. 1011 (1907) and State ex rel. Bussie v. Fant, 216 La. 58, 43 So.2d 217 (1949). Both cases are distinguishable from the instant case.
Tolson involved the validity of an election to approve a tax under constitutional and statutory provisions authorizing a tax in aid of railway enterprises. An agreement by the railway to divide the tax with the public schools was made a part of the proposition submitted to the people. The court held the election invalid as constituting “logrolling” in that the electorate was not given the opportunity to vote for or against the railway tax but was compelled to vote upon a hybrid proposition — part railway tax and part school tax. The case is distinguishable from the instant case in that in Tolson, the proposition went beyond the statutory authority which was limited to a railway tax. Further, in Tolson, the two taxes included in one proposition were entirely ttnrelated by nature or purpose.
Fant was a mandamus suit to require the City of Shreveport to submit to the electorate, pursuant to a petition, a single proposition to (1) raise salaries of employees of the fire department $.10 per hour, and (2) raise salaries of employees of the police department $.15 per hour. The court held that such an election, if called, would be invalid because the one proposition contained two separate and distinct proposals, citing Tolson. In the instant case, the proposals are not separate and distinct, but are interrelated, integral parts of one plan or program.
NOTICE
Defendants contend they were not afforded proper notice as required by 42 U.S.C.A. § 1455(d). This contention is not seriously urged in this court and we find the contention is without merit.
DECREE
For the reasons assigned, the writ of certiorari issued in each of these cases is herewith recalled, vacated and set aside *586 and each of the cases is hereby remanded to the Fourth Judicial District Court for further proceedings in accordance with law.
AYRES, J., dissents and assigns written reasons.
PRICE, J., dissents and assigns written reasons.